# UNITED STATES of America

v.

## Robert C. LEE.

### No. CRIM. A. 99–499.

United States District Court, E.D. Pennsylvania.

Jan. 20, 2000.

---

Judy Goldstein Smith, U.S. Atty's Office, Philadelphia, PA, for Government.

Elizabeth Ainslie, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

We consider here whether certain allegations against a criminal defendant can be prosecuted under the Bankruptcy Fraud statute, 18 U.S.C. § 157, a question which places us on the line between civil and criminal penalties for wrongful acts. As this statute is relatively new, having been passed in 1994, and has to date gone unconstrued,[1] we address this issue at some length.

### I. Procedural Background

On January 13, 2000, the Government filed a ten-count Superseding Indictment[2] charging Robert Lee with three counts of mail fraud, one count of conspiracy to defraud the United States, two counts of tax evasion, two counts of filing of false tax returns, and one count of bankruptcy fraud.[3] In advance of the trial scheduled to begin next Monday, Lee has moved to dismiss Count 10[4] of the Superseding Indictment, arguing that his actions, as the Government alleges them, do not amount to a violation of that statute.

### II. The Government's Allegations[5]

Robert Lee was an officer of Ostomy Specialists ("Ostomy"), a medical supply company that filed for bankruptcy under Chapter 11 of the Bankruptcy Code on May 4, 1995. Ostomy then became a debt-

---

1. Neither we nor the parties were able to locate any case law construing the application of § 157 in a manner pertinent to this case. The 1999 supplement to the United States Code Annotated, published by the West Group, contains no case annotations for 18 U.S.C. § 157.

2. The Government had filed its original fourteen-count Indictment on August 19, 1999. The Superseding Indictment deleted four of the mail fraud counts and made minor language changes.

3. The bankruptcy fraud count also alleged violation of 18 U.S.C. § 2, aiding and abetting.

4. Count 14 of the original Indictment.

5. The Superseding Indictment contains allegations of various conspiracies and frauds related to Lee's operation of several medical supply businesses and their Medicare billing practices. The bankruptcy fraud charges, however, are based on a more narrow set of alleged acts, and it is only these that we will describe here.

or-in-possession, and Lee, as a corporate officer of the debtor, became a fiduciary of the bankrupt estate. After Ostomy declared bankruptcy, Lee proposed to lease[6] some low-air-loss beds to Ali Industries ("Ali")[7] because Ostomy was no longer able itself to lease them directly to patients, since Ostomy had been suspended as a Medicare provider on February 15, 1995.

As it happens, the owner of Ali was an employee of Lee's in another business, and, according to the Government, Ali's owner had no experience in billing Medicare. The lease was to run from October 4, 1995 to May 15, 1996. Evidently because of the relationship between Ali's owner and Lee, and because of disputes over the level of compensation appropriate for Lee to earn on the lease, the creditors objected to the proposed lease and wrangling ensued in Bankruptcy Court. Only on April 29, 1996[8] did Lee actually file with the Bankruptcy Court a consent order providing the agreed payment provisions. Under the terms of the lease as filed with the Bankruptcy Court, Ali could keep twenty percent of any monies collected from Medicare for the release of the beds, and Ostomy would receive the remaining eighty percent. According to this April 29 consent order, Lee and his business partner would receive the lesser of (1) ten percent of the net receipts from Ostomy's lease of the beds to Ali or (2) $500.00 per week.[9]

Notwithstanding that final Bankruptcy Court approval was not obtained until late April of 1996, the lease had actually gone into effect the previous October.[10] The Government alleges that in December, 1995, the owner of Ali Industries hired, at Lee's prompting, Lee's then-fiancee, and later wife,[11] to act as a consultant to Ali on the bed lease contract. Ali paid Lee's wife at least $90,000[12] during December 1995 and January 1996; this payment was, the Government claims, an improper indirect payment to Lee.

On these alleged facts, the Government charges Lee with Bankruptcy Fraud, specifically under 18 U.S.C. § 157(2). The Government argues that the consent order that Lee filed in Bankruptcy Court on April 29, 1996 failed to disclose that he was receiving indirect payments from Ali through his to-be wife, and that, consequently, this filing served to execute or conceal a scheme or artifice to defraud, namely, Lee's negotiation of the lease and the arrangement for his fiancee to be hired

6.  Because Ostomy was a debtor-in-possession, all expenditures outside the normal course of business, evidently including this lease, must be approved by the creditors and the Bankruptcy Court.

7.  These beds are apparently leased by medical supply companies to individual patients. Here, evidently, the idea was for Ali to re-lease to patients the beds it leased from Ostomy.

8.  The Bankruptcy Court apparently entered the order authorizing the lease on April 26, 1999, leading to some discrepancies in the Superseding Indictment between the date of Lee's filing (April 29, 1996) and the dates of his alleged fraudulent scheme ("October, 1995 through on or about April 26, 1996"). As these discrepancies do not affect our disposition of this motion, we will not consider them further.

9.  That is, their take was capped at a weekly payment of $500.00; this would provide a maximum payment of approximately $15,500 over the course of the lease.

10.  Had the Bankruptcy Court not ultimately approved the lease, those gaining money as a result of the lease would have been subject to disgorgement of these funds to the court.

11.  The Superseding Indictment does not refer to this woman by name, so we are left to refer to her by title. She is also separately referred to as "Person # 5": "Person # 5 known to the grand jury married defendant ROBERT C. LEE on or about April 19, 1996." Superseding Indictment Count 1 at ¶ 32.

12.  The result, claims the Government, of "an inflated hourly rate." Assuming that Lee's wife worked eight-hour days and five-day weeks as a consultant during the two months alleged (containing approximately 40 workdays), the $90,000 payment would yield an hourly wage of about $280.00.

as a consultant so Lee could funnel money to himself.

## III. *The Statute*

18 U.S.C. § 157[13], "Bankruptcy Fraud", states:

> A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—
>
> > (1) files a petition under title 11;
> >
> > (2) files a document in a proceeding under title 11; or
> >
> > (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,
>
> shall be fined under this title, imprisoned not more than 5 years, or both.

As noted at the outset, neither we nor the parties have found any case interpreting this new law. The statute's legislative history,[14] in House Report 103–835,[15] notes that the statute is meant to cover "any person who knowingly, fraudulently, and with specific intent to defraud uses the filing of a bankruptcy petition or document, or makes a false representation, for the purpose of carrying out a fraudulent scheme." H.R. 103–394, at 57. The Report stresses that specific intent to defraud must be found. On the other hand, according to the Report, the statute would *not* cover either (1) someone who makes a misrepresentation on a financial statement, and then subsequently goes into bankruptcy, so long as the defendant had not, at the time of the misrepresentation, planned the bankruptcy as part of the scheme; and (2) someone who makes a false statement or promise in a bankruptcy proceeding, so long as this statement or promise was not made as part of a scheme to defraud involving the bankruptcy proceeding. *See id.* at 58.

## IV. *Analysis*

▓▓▓▓ In assessing whether Lee's conduct is properly charged under 18 U.S.C. § 157, we are guided by the canon of strict construction, or the rule of lenity, which directs us to resolve ambiguities in a criminal statute so as to apply it only to conduct the statute clearly covers. *See, e.g., United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997). Moreover, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.*

On this standard, and upon a close reading of both the statute and the Superseding Indictment, we find that due process will not support charging Lee under 18 U.S.C. § 157.

The Government alleges that § 157 was triggered by the consent order Lee filed on April 29, 1996, which allegedly executed or concealed the fraudulent scheme to obtain indirect payments through his wife's lease consulting services. As an initial matter, we note that the veracity of the consent order, *per se,* is not an issue. The Government makes its allegations not under § 157(3), involving a "false or fraudulent representation, claim, or promise", but rather under § 157(2), requiring merely "fil[ing] a document in a [bankruptcy] pro-

---

**13.** Pub.L. 103–394, Title III, § 312(a)(1)(B), 108 Stat. 4140 (Oct. 22, 1994).

**14.** We are mindful that opinions differ as to the proper use, if any, of legislative history in construing a statute, *see, e.g.,* William N. Eskridge, Jr., *The New Textualism,* 37 UCLA L.Rev. 621 (1990). As Justice Scalia put the matter with characteristic pungency:

> Judge Harold Leventhal used to describe the use of legislative history as the equiva-

lent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.

*Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993)(Scalia, J., concurring). In the absence of other commentary on § 157, however, we will (with apologies to Justice Scalia) discuss it here.

**15.** 1994 U.S.C.C.A.N. 3340, 3366–67.

ceeding". Indeed, the Government does not dispute that there *was* a lease and that Lee in fact received payments in accordance with the consent order that he filed.

Thus, we are left to consider exactly how the filing served the "purpose of executing or concealing" the alleged fraudulent scheme.[16] Addressing first the issue of "executing", we observe that the filing was made on April 29, 1996, while the allegedly fraudulent payments had been made over three months before, in December of 1995 and January of 1996. This time sequence naturally raises the issue of causation—how could the later filing have "executed" the earlier payment? The Government argues that without the April 29, 1996 filing with the Bankruptcy Court, the bed lease from Ostomy to Ali would have ultimately been rendered invalid and Lee's wife could then have been compelled to return her consultant's fees, and thus the scheme to defraud would have failed. The filing, the Government avers, was therefore necessary to the execution of fraud.

This notwithstanding, we cannot agree that § 157(2) criminalizes this behavior. Prior to the filing on April 29, 1996, Lee's wife had already pocketed the consultant's fee from Ali. Had Lee not filed the consent order, the creditors would have been left with civil remedies, through the Bankruptcy Court, to recover the monies paid out to Lee's wife, and the fact remains that she already had the money at the date of the filing. Given the strict construction we must apply to criminal statutes,—especially to those not previously construed—we cannot find that Lee's *post hoc* filing was in execution of this antecedent putative fraud. The Government's argument would

have us regard the bankruptcy filing with respect to 18 U.S.C. § 157(2) much as the use of the mails has come to be seen in mail fraud prosecutions under 18 U.S.C. § 1341[17]: that *any* bankruptcy filing related at all to a "scheme or artifice to defraud" would act essentially as a jurisdictional element to pull a fraud into federal crime.[18] We decline to give § 157 such breadth without more specific direction from Congress.

A second question is whether Lee's filing can be interpreted as having the purpose of "concealing" the scheme to defraud. Here, the Government avers that the filing concealed the fraud because it represented to the Bankruptcy Court that Lee would be compensated in a certain way for the bed lease, when in fact he had, indirectly through his wife, received additional payments. The Government argues that this non-disclosure amounts to an affirmative act of concealment that falls under § 157(2).

Again, we cannot agree with the Government's position. As the fiduciary of a debtor-in-possession, Lee doubtless had a duty, in filing the consent order, to fully disclose all of his remuneration from the lease. Again, however, this is a civil concern, not a criminal one. To hold that such a non-disclosure acted to conceal the scheme to defraud would take an omission that already leads to civil liability and pile upon it criminal sanctions. Such criminalization of an omission would be to expand § 157 to the breadth of, for example, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and the jurisprudence thereunder.[19] Compare the extraordinary breadth of Exchange Act § 10(b)—

---

**16.** Even if the allegation were under § 157(3), we would still have to resolve the "executing or concealing" issue; however, in a § 157(3) case the Government would have additionally to prove the false or fraudulent character of the representation.

**17.** The "scheme or artifice to defraud" and "purpose of executing" language in 18 U.S.C. § 157 is similar to that found in 18 U.S.C. § 1341.

**18.** When queried on this point at the hearing, the Government denied that it saw the bankruptcy filing as analogous to a use of the mails in mail fraud, but we are unable to see how we could stop short of such an interpretation if we found Lee's actions to be chargeable under § 157(2).

**19.** *See, e.g., Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

It shall be unlawful for any person, directly or indirectly, ...

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.[20]—

with the bare bones language of § 157(2). Without clearer guidance from Congress in the text of the statute, we will not create a crime of omission from Lee's *post hoc* alleged failure to meet his fiduciary duty of disclosure to the Bankruptcy Court and the creditors. To do so would deprive Lee of his due process rights to have fair warning of his criminal liability. *See Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964) ("The ... principle is that no [person] shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (internal quotations marks omitted)).

## V. *Conclusion*

We do not doubt that Lee's behavior, as alleged, was wrongful,[21] and it seems clear that such acts would lead to civil liability. Absent further guidance from Congress, however, we cannot with fidelity to due process read the language of 18 U.S.C. § 157 to criminalize the *post hoc* omission alleged here.

## *ORDER*

AND NOW, this 20th day of January, 2000, upon consideration of defendant's motion to dismiss Count 10 of the Superseding Indictment (docket number 17)

(formerly Count 14 in the original Indictment), and the Government's Response thereto, and defendant's reply thereto, and after oral argument on the motion, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that defendant's motion is GRANTED.

---

**20.** Pursuant to this legislative authority, the Commission promulgated Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b), which provides with respect to omissions that it is unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." This is precisely the language the Government would have us read into § 157.

**21.** For that matter, such behavior may even be criminally chargeable under some other section of the United States Code.