MILLER
vs
PORTER.

---

ASSUMPSIT.

# Miller *vs* Porter.

### APPEAL FROM THE BOURBON CIRCUIT.

*Case* 69.

#### *Contracts.    Public policy.    Jails and jailers.*

*January* 27.

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.—Judge Simpson did not sit in this case.

*Question stated.*

THE only question presented in this case is, whether the Circuit Court erred in instructing the jury to the effect that a contract between the owner of a runaway slave and the county jailer, by which the latter, for a reward to be paid, undertook to receive and keep safely in the public jail, the runaway slave then in possession of the owner, is contrary to public policy and to the law, and therefore, cannot be the basis of a recovery against the jailer upon the subsequent escape of the slave from the jail.

*Jails are public property.    The jailer is a public officer, and has charge of the jail*

1. The first consideration that presents itself in the investigation of this question is, that the jail is public property provided at the public expense for public uses, which are defined by law, and that the jailer is the officer

entrusted by law with the immediate possession and control of this public property for those public uses for which it was erected, and not to be used at his discretion for his own private convenience or emolument.

2. The running away of a slave is not a public but a private offence, the prevention and punishment of which the law leaves to the owner, without making any provision in aid of his rights, except that when a runaway slave is taken up by a stranger, he may be placed in a county jail where he may be reclaimed by the owner; or if not reclaimed within a certain period, may be sold for his benefit. It is undoubtedly for the public good, and therefore, a matter of public policy, that runaway slaves should be re-taken and placed in subjection to their proper owners. And the law in the provision referred to, lends its aid to the accomplishment of that object. But the law makes no provision for relieving the owner of the trouble or risk of keeping his slave actually in his possession. This is not one of the purposes for which the jail was erected or the jailer provided. The law presumes that the owner is competent to control and manage his own slave, and leaves the trouble and expense and responsibility of so doing to be borne or provided for by him.

3. It cannot, therefore, be said that the fact that a slave is a runaway re-captured by his owner, furnishes any ground, in view of the public policy, for taking such a slave rather than others, into the public jail. The fact that there is an express provision for the case of runaways taken up by strangers, and none for those of which the owner has regained the possession, negatives all inference of any peculiar policy which would authorize the reception of the latter into the jail, rather than any other slave which the owner might, from any cause, desire to place in the jail for safe keeping.

4. The reception and custody of a runaway slave stands upon no other ground than that of accommodation to the owner and profit to the jailer. If upon these grounds and without the authority of any law, the jail may, at the discretion of the jailer, be converted to private uses, it is difficult to fix any limit either to the na-

MILLER
vs
PORTER.

for public purposes, not for his own private purposes.

The jailer has no authority to appropriate the jail to the purpose of confining runaway slaves at the instance of the owner.

Slaves committed to jail by the owners are not *runaways* within the contemplation of the statute on that subject.

It is against public policy to permit a jailer to place slaves in the public jails at the instance of their owners, and no contract to pay is implied on the part of the

MILLER
vs
PORTER.

owner for slaves
so kept by a jail-
er, or is enforci-
ble at law, nor
liability for an
escape.

ture or the extent of the uses to which the public prop-
erty may be perverted. The motive of private gain
will always be an inducement with the jailer to appro-
priate the jail to the accommodation of those who might
desire its use for their private convenience. And the
obvious consequence would be, not only that the jail
would be subjected to injury in various ways, but that
the safety of lawful prisoners would be jeopardized,
and that in furnishing unauthorized accommodations to
others, the prisoners in his lawful custody, might be
subjected to inconveniences which the law does not in-
tend to impose. It may be supposed that the introduc-
tion of a single slave to be kept in the jail for the owner,
and when there was in fact, but one other person con-
fined in the jail, could produce none of these consequen-
ces, and might, therefore, be regarded as at least a harm-
less act. But in this very case the runaway slave and
the other prisoner, who was a slave confined upon a
charge of a heinous crime, actually made their escape,
and thus was realized one of the consequences mention-
ed as likely to arise from allowing jailers, at their dis-
cretion, to convert the public jail to private use for their
own profit.

This fact, however, can only serve as an illustration
of the principle. If it were conceded that no particu-
lar evil had followed in this case, from taking the runa-
way slave into the jail for custody, it must also be con-
ceded that there was no more right to do it in this case
than in others—that if it was lawful to take one slave,
it would have been equally so to have taken two or as
many as the jailer could make room for, and that if it was
lawful to take a slave because he had runaway, it was
equally lawful to take one that the owner feared would
runaway, or one that for punishment or any other cause,
he desired to be kept in confinement. And in fine, it is
obvious that if the contract shall have the sanction of
law in this instance, it will be sanctioning a practice by
which the private interest of the jailer may be put in
opposition to his public duties, to the hazard of the
public property placed under his care and of the com-

fort and health and safe keeping of the prisoners lawfully committed to his custody.

We are of opinion, therefore, that this and all other contracts by which the jailer undertakes, for a reward, to appropriate the jail to the accommodation of private persons, for uses not prescribed or plainly implied by law, are against law and public policy, not only as involving a direct breach of duty in converting the public property to private and unauthorized use, whereby it will be more or less injured, (which might be said even if he were not to receive a reward,) but also and more especially because it tempts the jailer to a violation of duty in this and other particulars which have been adverted to, and with the almost certain effect of producing consequences which are themselves in violation of the objects of the law and subversive of its policy. On such a contract neither party could maintain an action.

Wherefore, the judgment is affirmed.

*Hawes* for appellant; *Smiths and Robinson & Johnson* for appellee.